# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

HAMMEL J. CLARK,

      Plaintiff,

      v.

SGT. JASON A. DADDYSMAN,
WARDEN RICHARD J. GRAHAM, JR.,
DENISE GELSINGER, *former Assistant
Warden*,
LT. LARRY C. BENNETT,
SGT. THOMAS MENGES and
C.O. II ALICIA A. CARTWRIGHT,

      Defendants.[1]

Civil Action No. TDC-16-0921

## MEMORANDUM OPINION

Plaintiff Hammel J. Clark, a prisoner incarcerated at Western Correctional Institution ("WCI") in Cumberland, Maryland, has brought this civil rights action pursuant to 42 U.S.C. § 1983 against Warden Richard J. Graham, Jr., former Assistant Warden Denise Gelsinger, Lt. Larry C. Bennett, Sgt. Jason A. Daddysman, Sgt. Thomas C. Menges, and Correctional Officer ("C.O.") II Alicia A. Cartwright. Clark alleges that (1) Daddysman wrongfully took a religious headpiece from him; (2) Daddysman verbally and physically assaulted him as part of a pattern of harassment; (3) he was removed from the "honor building" and placed in a cell covered in human feces in retaliation for asserting complaints; and (4) his due process rights were violated when his administrative complaints about Daddysman and the headpiece's confiscation were mishandled and denied. Defendants have filed a Motion to Dismiss or, in the Alternative, for

---

[1] The Clerk shall amend the docket to reflect the full and correct names of Defendants.

Summary Judgment. Clark has responded with his own Motion to Dismiss, or in the Alternative, for Summary Judgment.[2] Having reviewing the pleadings, briefs, and exhibits, the Court finds that no hearing is necessary to decide the Motions. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion to Dismiss or for Summary Judgment is GRANTED IN PART and DENIED IN PART. Clark's Motion to Dismiss or for Summary Judgment is DENIED.

## BACKGROUND

### I.    March 15, 2016 Incident

On March 15, 2016 at approximately 9:00 a.m., Clark was in the WCI Medical Department for an appointment when Sgt. Daddysman, a correctional officer, noticed him. Clark is a practicing member of the Moorish Science Temple of America and regularly wears a kufi, a type of religious headpiece, to symbolize his faith. On this occasion, Daddysman approached Clark and asked him for his kufi. When Clark asked why, Daddysman first told him that it was not allowed because it was handmade, then after Clark continued to protest, he told Clark that the kufi was an unapproved color.

According to Clark, who uses a wheelchair, at this point Daddysman pulled out his handcuffs with his right hand, put his left hand on Clark's right shoulder, pressed down, and told Clark to hand over the headpiece. Clark held himself up using his left arm, until his left arm slipped, which caused his arm to go "on the outside of [the] wheelchair" and his shoulder to go "down and bent forward." ARP WCI-736-16 at 6, Defs.' Mot. Dismiss Ex. 30, ECF No. 39-33.

---

[2]    Clark is advised that pursuant to Local Rule 105.3, "memoranda in support of a motion or in opposition thereto and trial briefs shall not exceed thirty-five (35) pages, and reply memoranda shall not exceed twenty (20) pages, exclusive of (a) affidavits and exhibits, (b) tables of contents and citations, and (c) addenda containing statutes, rules, regulations and similar material." D. Md. Local R. 105.3. Clark's filings are in violation of this rule. In the future, briefs that violate these limitations will not be accepted for filing, or will be struck from the record.

Clark felt "a little pulling something" in his left shoulder. *Id.* In the following days, Clark's shoulder began to hurt, and he could not raise his arm without pain. Daddysman denies assaulting Clark on this date, and there is no video footage of this incident.

According to Clark, after Daddysman pressed down on his shoulder, Clark gave him the kufi. He asked to speak to a more senior officer, but was denied. Daddysman then filled out a confiscation form, gave it to Clark, and said, "Even if the hearing officer rule[s] for you, you still is not getting your shit back, I took it." ARP WCI-695-16 at 21, Defs.' Mot. Dismiss Ex. 24, ECF No. 39-27. He then called Clark a racial slur.

Immediately after this interaction, Clark returned to his cell, where he learned that he was being moved out of the "honor building" and into a cell in Housing Unit No. 3, which he considered the worst unit in the prison. Clark alleges that this new cell had human feces and urine spread around in different spots, left behind by an inmate known to put his own feces all over his cell. When Clark refused to go into the filthy cell, the correctional officers threatened to place him in lock up. Clark asked to be put in one of the clean empty cells nearby, but that request was denied. According to Clark, he spent several days cleaning up the cell, feces got on his shoes, his wheelchair, and his hands, and the cell reeked of human waste even after the cleaning, so that he felt sick and could not eat. When he complained to Assistant Warden Denise Gelsinger about the conditions and Sgt. Daddysman's actions, she smiled and said, "Everybody gets a turn." ARP WCI-756-16 at 25, Defs.' Mot. Dismiss Ex. 31, ECF No. 39-34. She also asked him, "Did you ever stop to think it's just you?" Compl. at 27, ECF No. 4.[3] Clark remained in that cell for 14 days before he was returned to his original cell. Clark asked multiple correctional officers if they knew who had ordered his transfer to another cell. One officer, Lt.

---

[3] The citations to the Complaint are to the page numbers assigned by the Court's CM/ECF system.

McKenzie, told him: "[I]t came from high up." ARP WCI-756-16 at 26. Clark alleges that he was placed there in retaliation for standing up to Daddysman and for writing up complaints about Gelsinger in the past.

In response, Defendants have submitted the declaration of Lt. Robert Carder, who states that Clark was moved to a new cell on March 15, 2016 due to institutional needs and not as retaliation. Carder denies that the cell was covered in feces or that Clark ever complained about its condition to correctional officers in charge of the housing unit, but he also states that Clark was provided with ample cleaning supplies when he was moved to the new cell.

## II.     March 24, 2016 Incident

Because he could not lift his arm over his head without pain, Clark submitted a sick call request on March 22, 2016 and was seen by medical personnel on March 24, 2016. Daddysman was assigned to the Medical Department that day. According to Clark, while he was being evaluated for his injury, Daddysman listened in. Clark tried to tell the nurses discreetly that Daddysman had caused his shoulder injury. After the nurses had examined Clark and given him a sling, they asked him to wait outside the door for the paperwork to be completed. Clark asked if he could wait somewhere away from Daddysman, but before the nurses could answer his request, Daddysman "violently and aggressively with force grab[bed] the back of my wheelchair and yanked me and my body, dragging me backwards." Compl. at 13–14. Daddysman belligerently told Clark, "I don't ask nobody nothing, I just do what [I] am told." *Id*. at 14.

In response to these allegations, Defendants have submitted a declaration by Daddysman, who confirms that he was assigned to the Medical Department on March 24, 2016. He denies, however, that he violently grabbed Clark's wheelchair and yanked it around with Clark in it. C.O. II Mark Deatelhauser, who was also assigned to the Medical Department that day, has also

stated in a declaration that he never saw Daddysman grab Clark's wheelchair or engage in the alleged conduct. There is no video footage of an incident between Clark and Daddysman on March 24, 2016.

### III. April 1, 2016 Incident

On April 1, 2016, Clark returned to the Medical Department to have his shoulder x-rayed. Daddysman was again on duty. While Clark waited for his test results, Daddysman came by, told Clark that he could leave, then walked behind Clark as if to grab the wheelchair. Clark protested, saying, "No get off me, don't." *Id.* at 16. Daddysman put his hands in the air and then kicked the back of Clark's wheelchair as Clark began to roll away. In his declaration, Daddysman denies kicking Clark's wheelchair on April 1, 2016 or ever having physically or verbally assaulted Clark.

Daddysman's assertion, however, is belied by the video evidence. The record includes surveillance video of the Medical Department hallway on April 1, 2016 from 10:20:00 a.m. to 10:33:00 a.m. At 10:22:55, an inmate in a wheelchair, who appears to be Clark, exits a room into the hallway and stops to put on a sling. At 10:31:39, as Clark remains in the hallway, a correctional officer, presumably Daddysman, approaches and speaks to him. As Daddysman comes behind his wheelchair, Clark turns the wheelchair so that Daddysman cannot touch the handles. The officer briefly touches the wheelchair's right handle as the two appear to exchange words. At 10:31:48, the officer gestures for Clark to go down the hallway. As Clark turns and begins to move forward, Daddysman kicks the wheelchair with his right foot. The kick does not appear to have been delivered with much force, as the wheelchair does not jerk or change its forward momentum. Daddysman does not appear to touch Clark or the wheelchair again.

## IV.    Medical Care

On March 16, 2016, the day after his first incident with Daddysman, Clark was evaluated by a doctor but did not report that a correctional officer had injured his shoulder or that he had shoulder pain.  However, between March 22, 2016 and August 13, 2016, Clark submitted 15 sick call requests about his shoulder.  In the first request, submitted seven days after the March 15, 2016 incident with Daddysman, Clark stated, "I had an altercation with one of the officers on March 15, [20]16 where as he pressed down on my shoulder and back.  I am having more pain in my spine throughout my back and now my shoulder is hurting real bad," noting that the pain was in his "left shoulder, throughout my back and spine."  Med. Records at 169, Defs.' Mot. Dismiss Ex. 15, ECF No. 39-18.  This request also states that his pain started "at this level" on March 17, 2016.  *Id.*  In these sick call requests, Clark consistently complained of extreme shoulder pain and that his shoulder kept popping out of its socket.

On March 24, 2016, the first time that Clark saw medical personnel for his shoulder, Clark reported to them that he was experiencing left shoulder pain and that Daddysman had assaulted him by pressing down on his shoulder on March 15, 2016.  The nurse who saw Clark on that date noted that Clark was not moving his arm and gave him a sling.  Clark was seen again on April 1, 2016, where medical personnel again noted that Clark blamed his shoulder pain on a March 15, 2016 altercation with a correctional officer.  At this time, x-rays of the left shoulder were ordered.  The x-rays revealed no evidence of an acute fracture or dislocation.

For the next several months, Clark continued to be evaluated regularly and was provided both pain medication and physical therapy.  Clark consistently told medical providers that his left shoulder pain had been caused by a March 2016 incident with a correctional officer.  For example, notes from a June 18, 2016 medical appointment state:

[Clark] states injury first occurred in March 2016. [H]e reports altercation occur[red] with officer, he state[s] the officer leaned against the opposite shoulder . . . inmate reports he pushed up with his affected side to get officer off him[.] [U]ltimately he states his left . . . arm slipped off [wheelchair] arm rest, he states 2 days later his shoulder spontaneously dislocated but resolved with manual assistance that he does himself. [H]e states his shoulder has dislocated over 25 times since first happened.

*Id.* at 53.

On November 28, 2016, Clark underwent magnetic resonance imaging ("MRI") on his left shoulder. The MRI found "[p]rominent arthritic change at the glenohumeral joint and mild arthritic change at the AC joint." Supp. Med. Records at 419, Defs.' Mot. Dismiss Ex. 8, ECF No. 70-8. His rotator cuff was intact. On February 28, 2017, Clark was examined by an orthopedist, who ordered additional x-rays and suggested that Clark may need surgery to repair his rotator cuff if it was torn. An x-ray on March 2, 2017 showed "mild degenerative changes" in Clark's left shoulder joint. *Id.* at 418. Clark underwent arthroscopic shoulder surgery on May 23, 2017 to address his arthritis and to repair a torn left rotator cuff.

## V.    Administrative Remedy Procedure

Clark further alleges that the correctional personnel at WCI who respond to prisoners' administrative complaints filed under the Administrative Remedy Procedure ("ARPs") have denied him his due process rights. He alleges that they unnecessarily require him to re-write and re-submit his ARPs, impose additional requirements on him, switch the numbers on his cases, and intentionally delay their responses to his complaints.

Clark has filed a sizable number of ARPs. His ARP Index shows that from August 18, 2008 to January 17, 2017, he filed 59 ARPs at WCI. Seven of the ARPs, filed from March 2016 to April 2016, related to the three alleged assaults by Daddysman, the confiscation of Clark's religious headpiece, and the March 15, 2016 cell transfer. In April 2016 and June 2016, Clark

filed two ARPs against the ARP coordinators for the manner in which they processed his complaints. In June 2016, WCI limited Clark to filing two ARPs a month because, after he had filed 22 ARPs in the preceding six months, none had been found meritorious.

In response to Clark's claims that WCI personnel have undermined his use of ARP complaints, Defendants have submitted declarations from WCI's ARP Coordinators, Sgt. Menges and C.O. II Cartwright, who both affirm that all ARPs received at WCI are logged and investigated in accordance with Maryland Department of Public Safety and Correctional Services ("DPSCS") Directives. Menges and Cartwright also assert that they have never attempted to hinder or stop Clark from pursuing the ARP process.

Although Clark alleges that the ARP coordinators thwarted his complaints, his ARPs about the March 15, 2016 and March 24, 2016 incidents resulted in an Internal Investigation Division ("IID") investigation. The investigator interviewed Clark, Daddysman, and personnel who were in the Medical Department on March 15, 2016. The investigator also interviewed a security official who reviewed surveillance video of these incidents. The investigator concluded that there was no evidence to support Clark's allegations. The surveillance video from those dates was no longer available, the individual who reviewed the surveillance video after Clark's complaints reported that he saw no evidence of an assault, and the two medical personnel who Clark named as witnesses of the March 15, 2016 assault stated that they never saw Daddysman assault Clark.

Clark also appealed his ARPs to the Inmate Grievance Office ("IGO") six times between May 2016 and August 2016. The subjects of his appeals included the confiscation of his headpiece, his transfer to a filthy cell, and the manner in which the ARP coordinators handled his complaints. The appeal regarding Clark's headpiece was referred to an administrative law judge

("ALJ"), who held hearings on August 2, 2016 and October 26, 2016. The ALJ dismissed Clark's grievance on January 13, 2017, finding that Clark had not proven that the kufi was purchased from an authorized source, that the kufi was subject to confiscation because of its age-related deterioration, and that Clark's right to free exercise of religion had not been violated because he owned three other kufis. Clark's remaining appeals were administratively dismissed.

## VI. Supervisory Defendants

Clark alleges that he wrote to Warden Graham after the March 15, 2016 incident and reported Daddysman's harassment, the confiscation of the headpiece, and the transfer to the feces-covered cell. The Warden, however, did nothing in response.

Clark also alleges that Assistant Warden Gelsinger is responsible for Daddysman's misbehavior and for the retaliatory cell transfer. Clark has known Gelsinger since 2006 or 2007 and has written several complaints about her, including one as recently as December 14, 2015. Clark also alleges, as proof that she dislikes him, that Gelsinger dismissed an ARP that Clark filed against Daddysman in 2014, after Daddysman had confiscated a piece of Clark's religious jewelry.

## DISCUSSION

In their Motion, Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. In support of the Motion, Defendants argue that (1) Clark has produced no evidence that Daddysman assaulted him; (2) Clark's claim that his headpiece was wrongfully taken fails because he was provided with an adequate post-deprivation remedy; (3) Clark's conditions-of-confinement claim necessarily fails because he has not alleged any injury that resulted from his placement in the feces-covered cell; (4) Clark's conclusory allegations are insufficient to support his claim of retaliation; (5) Clark has no constitutionally

protected right to have his ARP complaints addressed or processed in a particular manner; (6) Clark cannot demonstrate that Warden Graham and Assistant Warden Gelsinger are liable under a theory of supervisory liability under § 1983; and (7) Defendants are entitled to qualified immunity.

## I.     Legal Standards

### A.     Motion to Dismiss

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

### B.     Motion for Summary Judgment

Clark and Defendants have each submitted evidence for the Court's review. Although a party may move for summary judgment before the commencement of discovery, *see* Fed R. Civ. P. 56(b), "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). The proper procedure for seeking additional time for

discovery is to file an affidavit pursuant to Rule 56(d) explaining why the party needs discovery to establish the existence of a genuine issue of material fact. *Id.* If a party does not submit a Rule 56(d) affidavit, the Court may, but need not, consider a request for discovery presented in the non-movant's memorandum of law opposing summary judgment. *Id.* at 244–45.

Clark has not submitted a Rule 56(d) affidavit, but embedded in Clark's Motion for Summary Judgment is a request that the Court direct Defendants to turn over unspecified records to Clark that would show the names of inmates who have filed complaints against Daddysman. Clark claims that these records would reveal Daddysman's bad character. Clark also seeks the Court's assistance in obtaining unidentified affidavits. Clark tried to get affidavits from other inmates but was unable to do so due to prison security and the transfer of inmates. He does not describe what those affidavits would have said. Finally, Clark requests access to unspecified prison video footage.

Upon consideration of these requests, the Court finds that Clark has not demonstrated how the additional materials would create a genuine issue of material fact where one does not already exist. Evidence of prior negative incidents between Daddysman and other inmates is not necessary to resolve the Motions. To the extent that Clark seeks affidavits of witnesses to the alleged events, the Court already has access to their accounts from the report of the IID investigation. Otherwise, he has not provided any description of the purpose of such affidavits to warrant discovery at this time. Finally, the Court has previously denied Clark's request for prison video recordings because he has been given access to the video of the April 1, 2016 incident, and the remaining videos have been determined to no longer exist. The Court will therefore construe both Motions as motions for summary judgment.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.     Prisoner Abuse

Clark alleges that Daddysman violated his constitutional rights by assaulting him three times:  on March 15, 2016, March 24, 2016, and April 1, 2016. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To establish an

Eighth Amendment violation, an inmate must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams*, 77 F.3d at 761. On the subjective element, an inmate must show that the guards used force "maliciously or sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In assessing this element, a court should consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat;" and "(4) any efforts made to temper the severity of a forceful response." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 321).

As for the objective level of harm, a party asserting an Eighth Amendment excessive force claim must demonstrate that the officer used a "nontrivial" amount of force. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 37 (quoting *Hudson*, 503 U.S. at 9). Although inmates must show the application of nontrivial force, an Eighth Amendment violation can occur even if that force did not cause serious injury. *Id.* at 38 ("[A]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. The extent to which injuries are modest is accounted for in the award of damages. *See Wilkins*, 559 U.S. at 40.

Other than Clark's account, there is little evidence that the March 15, 2016 and March 24, 2016 assaults occurred as alleged. In the March 15, 2016 incident, Daddysman allegedly placed his hand on Clark's right shoulder and pressed down. Although Clark has asserted that two medical records personnel would credit his version of events, these individuals contradicted Clark by denying that any assault had occurred during their interviews in the IID investigation. No video recording of the incident exists because, according to Capt. George Sneathen, when he reviewed it he found no evidence of an assault and therefore failed to retain it.[4] As for Clark's shoulder injury, Clark was seen in the Medical Department the day after the incident, but he offered no complaint of such an injury, nor did he advise the doctor that he had been assaulted by Daddysman. Clark did not complain about an alleged assault until a week later, on March 22, 2016. Notably, Clark acknowledges, and the medical records confirm, that Clark's shoulder problems are with his *left* shoulder, while Clark alleged that Daddysman had pushed down on his *right* shoulder. In any event, the medical records do not show that either shoulder sustained an injury readily traceable to an individual pressing down upon it.

As for the March 24, 2016 incident, when Daddysman allegedly yanked Clark's wheelchair in a violent manner, Deatelhauser, who was also in the medical unit at the time of the alleged assault, denies under oath that Daddysman assaulted Clark. Once again, the video recording was not retained, even though it was reviewed and reportedly did not show any assault upon Clark. Moreover, both of these March 2016 incidents were investigated by an IID officer,

---

[4]  In referencing the lack of available video evidence, the Court does not condone the practice of failing to retain video evidence even if previously reviewed and deemed to lack probative value. When there is an allegation of misconduct, a video recording of the encounter, regardless of what it shows, is probative evidence on the issue and must be retained. In the future, failure to retain such evidence may result in the drawing of an adverse inference against the prison officials, even if there is a witness who claims to have reviewed it and seeks to attest to its contents. *See Vodusek v. Bayliner Marin Corp.*, 71 F.3d 148, 155–56 (4th Cir. 1995).

who, after reviewing the available evidence and interviewing witnesses, determined that there was insufficient evidence to substantiate Clark's claims that he had been assaulted.

There is evidence, however, supporting Clark's allegations regarding the April 1, 2016 incident, when Daddysman kicked Clark's wheelchair. Surveillance video of the event clearly depicts Daddysman delivering a kick to the back of Clark's wheelchair as Clark was moving away. As Daddysman denied under oath that he ever kicked Clark's wheelchair, this video evidence severely undermines Daddysman's credibility. The Court can therefore afford little weight to Daddysman's denials that he mistreated Clark on March 15, 2016 and March 24, 2016.

Nevertheless, even if the Court were to credit entirely Clark's accounts of these three events, Clark has failed to allege actions by Daddysman that constitute an Eighth Amendment violation. In the March 15, 2016 incident, Clark's allegation is that Daddysman ordered Clark to surrender his kofi while pulling out his handcuffs with his right hand and pressing down on Clark's right shoulder with his left hand. He does not allege that the action was sufficiently forceful to cause pain to his right shoulder, whether immediately or later, but instead claims that in reacting to it, Clark's left arm slipped, causing him to "pull[] something" in his left shoulder. ARP WCI-736-16 at 6. Even so, he did not believe at the time that he had been injured. Under these circumstances, Daddysman's action did not meet the objective standard of force that could be deemed punishment under the Eighth Amendment. *See Wilkins*, 559 U.S. at 39 ("[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action."); *DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000) (holding that a single shove that pushed the plaintiff into a door frame and caused bruising, unaccompanied by further use of force, was insufficient to state an Eighth Amendment claim). *See also Smith v. Sec'y, Dep't of Corr.*, 524 F. App'x 511, 514 (11th Cir. 2013) (holding that twisting a prisoner's arm and pressing the prisoner against a wall

are insufficient uses of force to violate the Eighth Amendment). Likewise, even considering Clark's allegations that Daddysman spoke to him belligerently and used a racial slur at the end of the encounter, the alleged pressing on Clark's shoulder as Daddysman sought to secure Clark's kufi as contraband did not constitute a use of force "maliciously or sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6. Thus, under both the objective and subjective prongs, Clark's allegations do not assert a valid Eighth Amendment claim arising from the March 15, 2016 incident.

Likewise, Daddysman's action on March 24, 2016, when he roughly grabbed Clark's wheelchair so as to briefly pull him backwards, without touching him or injuring him, was insufficient to meet the objective standard for punishment under the Eighth Amendment. *See Wilkins*, 559 U.S. at 39 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim."); *DeWalt*, 224 F.3d at 620.

Finally, upon review of the video of Daddysman's kicking the wheel of Clark's wheelchair on April 1, 2016, it is abundantly clear that it did not meet the objective standard for punishment and could not be deemed to have been subjectively perpetrated "for the very purpose of causing harm." *Hudson*, 503 U.S. at 6. Clark was already starting to wheel away, and the kick was light, barely registered on the wheelchair, and had at most a negligible impact on the speed and direction of Clark's wheelchair. *See Witt v. W. Va. State Police*, 633 F.3d 272, 276–77 (4th Cir. 2011) (stating that summary judgment is appropriate when a video of an incident shows that no reasonable jury could find in the plaintiff's favor); *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (finding, based on a video showing only incidental bumping of the plaintiff during a cell transfer, that the use of force did not violate the Eighth Amendment). Accordingly,

even when taking all of Clark's allegations as true, none of these incidents involved a use of force sufficient to meet the objective and subjective standards for an Eighth Amendment violation.

Finally, to the extent that Clark seeks to assert an Eighth Amendment claim based on the alleged verbal abuse by Daddysman, such a claim fails. "[N]ot all undesirable behavior by state actors is unconstitutional." *See Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Verbal abuse of inmates by guards, even with racial epithets or profanity, does not violate the Eighth Amendment. *Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999) (stating that the use of racial epithets, without more, does not form the basis of a constitutional violation); *Cameron v. Bonney*, 523 F. App'x 969, 970 (4th Cir. 2013); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) ([V]erbal abuse by a prison guard does not rise to a cause of action under § 1983); *see also Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C. 1990) ("The subjection of a prisoner to verbal abuse or profanity does not arise to the level of a constitutional deprivation."). Although the Court condemns any use of racial slurs or other abusive language by Daddysman against Clark, it nevertheless falls short of violating the Eighth Amendment.

## III.     Religious Headpiece

### A.     Free Exercise of Religion

Clark asserts that Daddysman's seizure of his kufi violated his First Amendment right to exercise his religion. "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Price v. Johnson*, 334 U.S. 266, 285

(1948)).  Prison restrictions that affect inmates' religious exercise but are reasonably related to legitimate penological objectives do not run afoul of the Constitution.  *See Turner v. Safley*, 482 U.S. 78, 89–91 (1987).  To determine whether a prison regulation is reasonable, and therefore constitutional, courts consider four factors:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (quoting *Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006)).

Although Daddysman confiscated the kufi based on the belief that it ran afoul of prison regulations restricting the possession of blue items or homemade items, the ALJ concluded that it was properly seized because Clark could not show that he obtained it from an authorized source, such as the prison commissary, and it appeared that it may have been acquired from an unauthorized source, such as inmates making kufis for distribution within the prison.  DPSCS Directive OPS.220.0004(E).  The ALJ also found that it had been altered from its original condition, in that its stitching had been picked apart and it had a small hole in it.  Accordingly, it violated a DPSCS Directive prohibiting inmates from keeping property that has been altered.  DPSCS Directive OPS.220.0004(E)(3)(b).  These restrictions are rational because they have a legitimate penological purpose, in that items that are from unauthorized sources or have been altered could be used to conceal contraband or present a health or safety hazard.  Where a case-by-case approach allowing possession of certain homemade or altered items would almost certainly be impractical, there was no obvious, easily enforceable alternative to this rule that

would have allowed Clark to retain the kufi.  Most significantly, Clark had alternative means of exercising his religious rights after his headpiece was confiscated.  He had three other kufis that were authorized.  Clark's religious exercise rights therefore were not violated.[5]  *See Wall*, 741 F.3d at 499.

## B.    Due Process

To the extent that Clark's claims regarding the confiscation of his headpiece include a claim that his property was improperly seized without due process of law, his claim fails.  In the case of lost or stolen property, sufficient due process is afforded to a prisoner if there is an adequate post-deprivation remedy process.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[W]e hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available."); *see also Parratt v. Taylor*, 451 U. S. 527, 540–41 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  The right to seek damages and injunctive relief in Maryland courts pursuant to the Maryland Tort Claims Act constitutes an adequate post-deprivation remedy.  *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).  Inmates also have the

---

[5]    Although Clark did not raise a claim pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5 (2012), a RLUIPA claim would have been similarly unavailing. RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a); *see Lovelace v. Lee*, 472 F.3d 174, 185–86 (4th Cir. 2006). Here, Clark has failed to allege a substantial burden on his religious exercise. At no point was he denied access to religious headpieces; he was merely denied access to a particular kufi that was no longer compliant with DPSCS Directives. *See Kaemmerling v. Lappin*, 553 F.3d 669, 677–78 (D.C. Cir. 2008) ("A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'") (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)).

additional post-deprivation remedy of the ARP process, which Clark pursued here, ultimately receiving multiple hearings before an ALJ. *See French v. Allegany Cty.*, No. CCB-11-2600, 2013 WL 4049682, at *4 (D. Md. Aug. 8, 2013). Therefore, assuming Clark's personal property was lost or destroyed as he alleges, such a claim does not rise to a constitutional violation.

## IV.    Cell Assignment

Clark asserts that his Eighth Amendment rights were violated when he was assigned to a cell with human feces spread around its interior. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko*, 535 F.3d at 238 (quoting *Williams*, 77 F.3d at 761). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)).

The objective prong of a conditions claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or

demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)).  Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded.  *See Wilson*, 501 U.S. at 302–03 (applying the deliberate indifference standard to conditions of confinement claims).  "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Courts have repeatedly held that leaving a prisoner in a cell containing human waste is sufficiently dangerous to an inmate's health and safety as to satisfy the objective prong of this test.  *See Williams v. Griffin*, 952 F.2d 820, 825 (4th Cir. 1991) (holding that overcrowded cells with sewage and urine, as well as insects and vermin, support an Eighth Amendment claim); *Walker v. Schult*, 717 F.3d 119, 126–27 (2d Cir. 2013) (holding that unsanitary cell conditions, including urine and feces on the floor, can constitute cruel and unusual punishment); *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (affirming a finding of an Eighth Amendment violation based on filthy living conditions including fecal matter and urine in cells); *McBride v. Deer*, 240 F.3d 1287, 1291–92 (10th Cir. 2001) (holding that three days in a feces-covered cell is a sufficient basis to state an Eighth Amendment claim); *Howard v. Adkison*, 887 F.2d 134, 137

(8th Cir. 1989); *see also Taylor v. Larson*, 505 F. App'x 475, 477 (6th Cir. 2012). "Not surprisingly, human waste has been considered particularly offensive so that 'courts have been especially cautious about condoning conditions that include an inmate's proximity to it." *McBride*, 240 F.3d at 1292 (citations and alterations omitted). *Shakka*, cited by Defendants, is not to the contrary. In *Shakka*, the United States Court of Appeals for the Fourth Circuit held that the Eighth Amendment had not been violated when a prisoner was not permitted to shower for three days after other inmates threw human excrement on him, even though he was provided with cleaning materials to wash himself in his cell. 71 F.3d at 167–68. Beyond the fact that the exposure to human feces was significantly more limited in scope and duration than in the present case, the issue in *Shakka* was access to showers in response to a personal need to bathe caused by other inmates, rather than exposure to unsanitary cell conditions attributable to deliberate decisions by correctional officers' decisions on cell placement. *See id.*

Further, Clark alleged that when he was reassigned, he at first refused to enter the new cell because it was so filthy, and that he complained about his transfer immediately to both the Warden and the Assistant Warden, who did nothing. In particular, Clark's assertion that the Assistant Warden Gelsinger responded to his complaint by stating, "Everybody gets a turn" supports a claim that she acted with deliberate indifference. ARP WCI-756-16 at 25. These allegations that prison officials knew about the cell's condition and yet did not move Clark are sufficient to satisfy the test's subjective prong.

Nor are Defendants entitled to qualified immunity on this claim. Government officials sued in their individual capacity may invoke qualified immunity. *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013). "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Id.* (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999)). To overcome a claim of qualified immunity from a § 1983 claim, there must be a showing that (1) the government official violated a federally protected right of the plaintiff; and (2) that right was clearly established at the time of the alleged misconduct, in that a "reasonable official would understand that what he is doing violates that right." *Id.* Because one of the purposes of qualified immunity is to "protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government,'" the United States Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton,* 483 U.S. 635, 646 n.6 (1987) (citations omitted). If the Court determines that the government official took actions that a reasonable officer could have believed were lawful, then the official is entitled to dismissal before discovery. *Id.*

Clark alleges that he was moved to the feces-covered cell in 2016. By that point, the Supreme Court had ruled generally in *Helling* that a "condition of confinement that is sure or very likely to cause serious illness" can violate the Eighth Amendment. *Helling*, 509 U.S. at 33. In *Williams*, the Fourth Circuit had made clear that unsanitary cell conditions, in part based on the presence of sewage and urine, can form the basis of an Eighth Amendment claim. *See Williams*, 952 F.2d at 825; *see also Hite v. Leeke*, 564 F.2d 670, 673 (4th Cir. 1977). As discussed above, the United States Courts of Appeals for the Second, Fifth, Eighth, and Tenth Circuits had all ruled specifically that placing an inmate in a cell with human waste can constitute an Eighth Amendment violation. *See, e.g.*, *Gates*, 376 F.3d at 338 (listing cases). A consensus among courts that provide persuasive authority can support a finding that a rule is clearly established law. *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Booker v. S.C. Dep't of*

*Corr.*, 855 F.3d 533, 538–39 (4th Cir. 2017). Based on these decisions, reasonable correctional personnel could not have believed that placing an inmate in a cell covered with human feces was lawful. Defendants are not entitled to qualified immunity for this claim.

Where Clark has stated a plausible Eighth Amendment claim based on the condition of his cell, Defendants argue that the Court should grant summary judgment based on the record evidence. Clark states under oath that prison officials "forced me to go in that cell" when they knew "that the previous inmate had left human waste spread[] around in the cell." Mem. Opp. Mot. Dismiss at 40, ECF No. 42. Although Defendants contest this point, the evidence they have provided is not dispositive. In his declaration, Lt. Carder, asserts that Clark was never "housed in a cell covered in feces," but he did not deny that the cell may have contained human waste. Carder Decl. ¶ 2, Defs.' Mot. Dismiss Ex. 5, ECF No. 39-8. Curiously, he did not attest to the cell's sanitary conditions, but instead emphasized that Clark, who uses a wheelchair, was provided with "ample time and supplies in order to clean the cell," which is far from a denial that there was human waste or other unsanitary conditions in the cell. *Id.* He also asserts that Clark never complained about the cell conditions to "his Wing Officer, Officer in Charge (OIC) or Housing Unit Manager," but does not contradict Clark's statement that he complained to both the Warden and Assistant Warden. *Id.* At most, Lt. Carder's statement creates a genuine issue of material fact whether the cell, in fact, had feces spread inside of it, and whether the conditions were sufficiently unsanitary as to implicate the Eighth Amendment. Because there is a genuine issue of material fact, summary judgment will be denied on this claim.

## V. Retaliation

Clark further asserts that his cell transfer, from an "honor building" to a feces-covered cell, was perpetrated in retaliation for his filing grievances against Daddysman and Assistant

Warden Gelsinger.  To establish a retaliation claim against prison officials, an inmate must show that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right.  *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).  Here, Clark alleges retaliation in response to the exercise of his First Amendment right to petition for the redress of grievances.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."  *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct.  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections."  *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001).  Accordingly, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment.  *Booker*, 855 F.3d at 545; *see also Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (finding that filing a prison grievance alleging excessive force is protected by the First Amendment); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (same).

Qualified immunity is not available for this claim because this right was clearly established as of March 2016. *See Booker*, 855 F.3d at 536, 545 (finding that the right to be free from retaliation for filing a grievance pursuant to an existing prison grievance procedure was clearly established as of the time of alleged retaliatory activity in 2012).

Here, Clark filed grievances against Daddysman and Assistant Warden Gelsinger and thus engaged in protected activity under the First Amendment. As for the requirement that the defendant took an action adversely affecting First Amendment rights, a plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500). Clark's assertion that he was moved to a cell with human feces for two weeks satisfies this requirement. *Cf. Martin*, 858 F.3d at 250 (finding that placing an inmate in administrative segregation constitutes an adverse action).

Finally, Clark must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.* at 501. Here, Clark has alleged that he was moved on March 15, 2016, the same day that Daddysman first assaulted him and approximately two months after he filed multiple ARP complaints against Gelsinger. Notably, however, Clark did not file his first ARP against Daddysman for the March 2016 assaults until March 28, 2016, two weeks after he was moved to the new cell. Thus, the ARPs against Daddysman could not have triggered a retaliatory cell transfer. Clark asserts that the cell transfer was likely retaliation for his immediate response to Daddysman when confronted about his kufi on March 15, 2016. According to Clark's account,

however, even though he protested the seizure of his kufi and requested to speak to a more senior officer, he peacefully surrendered it, and he did not threaten to file a grievance at that time. While a formal prison grievance would constitute clearly established First Amendment protected activity, the same cannot be said for general oral disagreements with a correctional officer. *See Booker*, 855 F.3d at 545 (recognizing a clearly established right to file prison grievances free from retaliation). Although Clark had filed an ARP against Daddysman in August 2014 regarding a separate incident, the over 18-month period between that ARP and Clark's cell transfer is insufficient to show a causal connection between Clark's protected activity and the allegedly retaliatory conduct. The Court therefore will grant summary judgment to Defendants on Clark's claim that Daddysman retaliated against him because he complained about Daddysman's actions on March 15, 2016.

Clark has, however, stated a claim of retaliation in response to his complaints about Assistant Warden Gelsinger. Clark alleges that he has known Gelsinger since 2006 or 2007 and has written many complaints against her in that time, and the ARP Index shows that the most recent complaints about her were filed in December 2015. A three-month period between the First Amendment activity and the alleged retaliation is sufficient to support an inference of retaliation. *See Constantine*, 411 F.3d at 501 (holding that a four-month span between protected activity and alleged retaliatory activity was sufficiently proximate to support a First Amendment retaliation claim). This conclusion is bolstered by the fact that when Clark complained about his transfer to the feces-covered cell and Daddysman's actions, she smiled and stated, "Everybody gets a turn," ARP WCI-756-16 at 25, and "Did you ever stop to think it's just you?" Compl. at 27. There remain unanswered questions on this issue, including who decided to transfer Clark, what role Gelsinger played in that decision, why Clark was transferred only to be returned to his

original cell only two weeks later, why he was transferred to that particular cell as opposed to other available cells, and the condition of the cell at the time of the transfer. Because this claim involves genuine disputes of material fact, summary judgment is not warranted at this time.

## VI. ARP Process

Clark's allegations that Defendants failed to process his ARPs properly, needlessly ordered him to rewrite and resubmit his ARPs, and otherwise mishandled his ARPs fails to state a claim. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker*, 855 F.3d at 541 (discussing *Adams*, 40 F.3d at 72). Because prisons do not create a liberty interest protected by the Due Process Clause when they adopt administrative mechanisms for hearing and deciding inmate complaints, the failure to abide by those administrative mechanisms does not create a constitutional claim. *See Ewell v. Murray*, 11 F.3d 482, 487–88 (4th Cir. 1993); *Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, *arguendo*, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated."); *Ireland v. Morgan*, No. WDQ-10-1943, 2012 WL 503820, at *7 (D. Md. Feb. 14, 2012). Even if correctional staff did not satisfactorily investigate or respond to Clark's ARPs, his claim fails as he has not demonstrated any constitutional injury.

Furthermore, Clark has failed to provide anything more than conclusory allegations that WCI personnel ignored their own procedures when addressing his ARPs. Such statements are insufficient to show that ARP procedures were not followed and are inconsistent with the record provided to the Court, which shows that Clark had ample access to the ARP process. Although Clark did not always follow appropriate staff directions to submit ARPs in a concise, non-repetitive manner and with only the appropriate documentation, the record shows that Clark was

able to pursue each stage of the grievance process. He filed dozens of ARPs and no less than six appeals with the IGO between May 2016 and August 2016. Clark was even provided with a hearing before an ALJ on his complaint that his kufi was improperly confiscated. After having completed these steps, Clark was able to file his claims in federal court. Clark has therefore not suffered any constitutionally protected injury arising from the ARP process.

## VII. Supervisory Liability

Finally, Clark seeks to impose liability on Warden Graham and Assistant Warden Gelsinger for the allegedly unconstitutional harms that he has experienced. Because the Court will dismiss all of Clark's claims except for those relating to his cell transfer, the Court will consider Clark's supervisory liability argument only to the extent that Clark seeks to hold Graham and Gelsinger liable for the conditions of the cell and the alleged retaliation.

The doctrine of vicarious liability does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (stating that there is no *respondeat superior* liability under § 1983). Rather, in a § 1983 suit, liability of supervisory officials is "premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, to establish supervisory liability under § 1983, a plaintiff must show (1) that the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals such as the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the alleged offensive practice; and (3) that there was a causal link between the supervisor's inaction and the constitutional injury suffered by the

plaintiff. *Baynard*, 268 F.3d at 235.

Clark has alleged that he immediately wrote to Warden Graham about his cell conditions, and that he complained to Assistant Warden Gelsinger in person two days after the transfer. He has not established whether and when Warden Graham received Clark's complaint. To the extent it was filed as an ARP, Clark did not file his first ARP on his cell conditions until March 31, 2016, by which time he had already been moved back to his prior housing unit. His ARP specifically referencing the feces was filed on April 6, 2016. Because Clark has not demonstrated that Warden Graham had actual or constructive knowledge, before Clark was moved out, that the cell was covered in feces, he has not shown how any inaction by Warden Graham was a cause of Clark moving to or remaining in the cell, or could be deemed to be tacit authorization of the actions of his subordinate officers. Accordingly, the claim against Warden Graham will be dismissed.

Clark's claim against Assistant Warden Gelsinger will be allowed to proceed. Because Clark alleges that he told Gelsinger in person about the cell's condition while he was still in the cell, and because Clark remained in that cell for over a week after that conversation took place, he has stated a claim for supervisory liability against Gelsinger. Summary judgment, however, is inappropriate at this time because whether the cell was actually covered in feces remains in dispute.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or for Summary Judgment is

GRANTED IN PART and DENIED IN PART. Clark's Motion to Dismiss, or in the Alternative,

for Summary Judgment is DENIED. A separate Order shall issue.


Date: March 22, 2018

THEODORE D. CHUANG
United States District Judge