**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

HAMMEL J. CLARK,

Plaintiff,

v.

DENISE GELSINGER,
JASON A. DADDYSMAN,
ROBERT CARDER,
CURRAN P. MCKENZIE,
WAYNE PURNELL,
MARC WHITESIDE and
JOHN/JANE DOE(S),

Defendants.

Civil Action No. TDC-16-0921

**MEMORANDUM OPINION**

Plaintiff Hammel J. Clark, a state prisoner incarcerated at the Jessup Correctional Institution ("JCI") in Jessup, Maryland, has filed this civil rights action pursuant to 42 U.S.C. § 1983 against various correctional officers at the Western Correctional Institution ("WCI") in Cumberland, Maryland, at which Clark was previously incarcerated. Defendants previously filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment, which the Court granted in part and denied in part. Defendant Denise Gelsinger, the former Assistant Warden of WCI, then filed a Second Motion for Summary Judgment, which was denied. After counsel was appointed to represent Clark, the Court granted leave for Clark to file a Second Amended Complaint ("SAC"), in which he added several defendants and claims. Clark's current action names as Defendants Assistant Warden Gelsinger, Cpt. Marc Whiteside, Cpt. Robert Carder, Lt. Curran McKenzie, Sgt. Jason A. Daddysman, Sgt. Wayne Purnell, and Correctional Officers ("C.O.") II

John/Jane Doe(s) ("the Doe Defendants"). All Defendants, with the exception of the Doe Defendants, have filed a new Motion to Dismiss or, in the Alternative, for Summary Judgment ("the Third Motion"). Having reviewed the Complaint and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Third Motion will be DENIED.

## BACKGROUND

The Court has previously set forth the factual background and procedural history of this case in its March 22, 2018 Memorandum Opinion, *see Clark v. Daddysman* ("*Clark I*"), No. TDC-16-0921, 2018 WL 1453333 (D. Md. Mar. 22, 2018), *appeal dismissed sub nom. Clark v. Gelsinger*, 738 F. App'x 244 (4th Cir. 2018), and in its March 19, 2019 Memorandum Order, *see Clark v. Gelsinger*, No. TDC-16-0921, 2019 WL 1255294 (D. Md. Mar. 19, 2019). In the SAC, Clark presently alleges that on March 15, 2016, after Sgt. Daddysman confiscated a religious headpiece from Clark, he was removed from a favorable housing unit and placed in a cell in a less desirable unit that was covered in human feces, in violation of the First and Eighth Amendments of the United States Constitution and Articles 25, 36, and 40 of the Maryland Declaration of Rights. He also asserts a claim of negligence. Where, based on the existing record, the facts as to these events have remained largely consistent, the Court incorporates by reference the factual background as set forth in *Clark I*. *Clark I,* 2018 WL 1453333, at *1-5. To the extent that additional facts derived from new evidence compiled since the rulings on the First and Second Motions are relevant to the disposition of the Third Motion, they will be specifically discussed below.

## DISCUSSION

In the SAC, Clark asserts the following nine counts, as numbered below: (I) a First Amendment claim against Assistant Warden Gelsinger for retaliation for filing grievances; (II) a

First Amendment claim against Sgt. Daddysman for retaliation for exercising his right to free exercise of religion; (III) an Eighth Amendment claim against Defendants for unconstitutional conditions of confinement; (IV) a § 1983 claim against Defendants for a conspiracy to deprive Clark of his Eighth Amendment rights; (V) an Eighth Amendment claim against Assistant Warden Gelsinger based on supervisory liability; (VI) a claim against Defendants under Article 25 of the Maryland Declaration of Rights for cruel and unusual punishment; (VII) a claim against Assistant Warden Gelsinger under Article 40 of the Maryland Declaration of Rights for infringement of freedom of speech; (VIII) a claim against Sgt. Daddysman under Article 36 of the Maryland Declaration of Rights for infringement of freedom of religion; and (IX) a negligence claim against Assistant Warden Gelsinger.

As a procedural matter, Clark argues that Defendants' present motion, which is entitled a Motion to Dismiss or, in the Alternative, for Summary Judgment, is not properly construed as a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) because Defendants have already filed Answers. Clark is correct that the clear requirements of Rule 12(b) direct Defendants to file a motion to dismiss under Rule 12 "*before pleading* if a responsive pleading is allowed." Fed. R. Civ. P. 12(b) (emphasis added). Where the Motion is not a proper Motion to Dismiss, the Court will construe Defendants' Motion as a Motion for Summary Judgment.

## I. Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II. Claims Resolved in *Clark I*

In their Motion, Defendants argue that they are entitled to summary judgment on all of Clark's federal constitutional claims. However, as the Court noted in its January 9, 2020 Order, in *Clark I*, the Court has already denied summary judgment to Assistant Warden Gelsinger on Counts I, III, and V in part because "[t]here remain unanswered questions on . . . who decided to transfer Clark, what role [Assistant Warden] Gelsinger" and others "played in that decision, why Clark was transferred only to be returned to his original cell only two weeks later, why he was transferred to that particular cell as opposed to other available cells, and the condition of the cell at the time of the transfer." *Clark I*, 2018 WL 1453333, at *13. The Court finds no reason to revisit its ruling, particularly where the new testimonial evidence gathered since the First and Second Motion does no more than highlight the continued existence of genuine disputes of material fact. Although in their depositions Defendants generally denied wrongdoing or a retaliatory motive and specifically asserted that the cell to which Clark was transferred was not unsanitary, Clark's contrasting testimony is sufficient to establish genuine issues of material fact on whether the cell was contaminated with feces and urine and on whether the transfer was in retaliation for grievances filed against Assistant Warden Gelsinger.

Moreover, beyond the conflicting testimony, Defendants' accounts leave several key questions unanswered. First, Defendants provided no explanation for why Clark, who was undisputedly designated to an "honor housing" unit for less problematic inmates, Housing Unit 1, had to be transferred to the less desirable Housing Unit 3 on March 15, 2016. Joint Record ("J.R.") 1356. None of the correctional officers who provided deposition testimony could identify who was responsible for Clark's move on March 15, 2016 or explain why the move was initiated. The only arguable explanation was a "guess" by Lt. McKenzie that where the occupant of the cell to which Clark was moved, Jerome Miller, was sometimes moved from one unit to another in order to "give staff a break from his antics," Miller and Clark were transferred to each other's cells because both inmates were handicapped. J.R. 865, 883. However, certain correctional officers admitted that records revealed that there were several vacant cells available at the time in Housing Unit 1 and Housing Unit 3, and no correctional officer was able to articulate why Clark was not moved into another empty cell. This failure is particularly troubling in light of the fact that the correctional officers agreed that there was widespread knowledge that Miller had a habit of urinating and defecating on himself and spreading the feces around his cell, and Clark specifically complained about the condition of Miller's cell when he was placed there. No one has explained why Clark had to be placed in Miller's cell at that time.

Thus, for the third time, the Court concludes that there are genuine issues of material fact about the conditions of the cell and the motivation for placing Clark in it that preclude summary judgment on the First and Eighth Amendment claims against Assistant Warden Gelsinger in Counts I, III, and V.

## III. Eighth Amendment

Beyond Assistant Warden Gelsinger, Clark also alleges that his Eighth Amendment rights were violated by all of the remaining Defendants when he was assigned to a cell covered with human feces and urine. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted).

As the Court concluded in *Clark I*, being forced to stay in a cell contaminated with human waste is "sufficiently dangerous to an inmate's health and safety as to satisfy the objective prong of this test." *See Clark I*, 2018 WL 1453333, at *10. As to the subjective prong of this analysis, the Court found in *Clark I* that "allegations that prison officials knew about the cell's condition and yet did not move Clark are sufficient to satisfy the test's subjective prong." *Id.* at *11. Although Sgt. Purnell testified in his deposition that despite Clark's complaints about Miller's hygiene, Miller's cell "was fine" at the time that he moved Clark there, J.R. 1001, Clark's contrary testimony establishes a genuine issue of material fact on this point. As for Cpt. Carder and Cpt. Whiteside, where Clark has asserted that he told Cpt. Whiteside about the feces in the cell and

records show that Cpt. Carder reviewed Clark's written complaint about the condition of the cell while Clark was still in Miller's cell, and these Defendants do not make any particularized arguments on why there is no genuine issue of material fact on this issue, the Court will deny the Motion as to these Defendants.

As to the remaining Defendants, Sgt. Daddysman and Lt. McKenzie both argue that they did not have the "requisite culpable state of mind" to be liable for a violation of the Eighth Amendment. Mot. Summ. J. at 26-27, 28, ECF No. 180-3. In particular, Sgt. Daddysman, who was not assigned to Housing Unit 3, testified that he does not take part in housing assignments outside of the infirmary and thus would not have been responsible for Clark's move to Miller's cell. However, WCI records show that although there was a meeting to discuss moving Miller at approximately 8:30 a.m. on March 15, 2016, no decisions were made. Then, later that morning, Clark was moved almost immediately after his confrontation with Sgt. Daddysman about his religious headpiece. In particular, Clark has testified that during that encounter, Sgt. Daddysman walked to an area of WCI near offices of the captains and the Assistant Warden, he was gone for more than twice as much time as it normally takes to come back from that area in the facility, and shortly afterwards Clark was moved to Miller's cell. In light of the timing of events and the circumstantial evidence that Sgt. Daddysman had conferred with Assistant Warden Gelsinger just before the transfer, there remain genuine issues of material fact as to his role in Clark's transfer and his knowledge of the conditions faced by Clark.

Similarly, Lt. McKenzie argues that his statement to Clark that the transfer decision was made from "'higher up' fails to rise to the level of a constitutional violation." *Id.* at 28. However, where Lt. McKenzie's statement implicitly demonstrates some level of knowledge about Clark's housing situation, and Clark has testified that he complained to Lt. McKenzie about the conditions

in Miller's cell, there remains a genuine issue of material fact on the Eighth Amendment claim against Lt. McKenzie.

For all of these reasons, the Court will deny the Motion as to the Eighth Amendment claim against all Defendants.

## IV. Section 1983 Conspiracy

Relatedly, in Count IV, Clark alleges a civil conspiracy under § 1983 to violate the Eighth Amendment by placing him in a cell covered with human waste for two weeks. To establish a conspiracy claim under § 1983, a plaintiff "must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 658 (2017) (quoting *Massey v. Ojaniit*, 759 F.3d 343, 357-58 (4th Cir. 2014)). "While they need not produce direct evidence of a meeting of the minds, [plaintiffs] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). The evidence "must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* Such a conspiracy claim also does not require the existence of an explicit agreement. *See Love v. Rumgay*, No. RDB-13-1402, 2016 WL 1028001, at *11 (D. Md. Mar. 15, 2016).

As discussed above, there is sufficient evidence to support Eighth Amendment claims against all Defendants. *See supra* part III. Clark has testified to facts connecting each of Defendants to these events, including that, when Clark refused to enter the cell because of the feces, Sgt. Purnell threatened to place him in lockup if he did not comply; that he complained about the cell conditions to Assistant Warden Gelsinger, Cpt. Whiteside, and Lt. McKenzie, all of whom

did not respond to his concerns; and that Cpt. Carder, as reflected in his initials on a routing slip for a letter sent by Clark to the Warden to complain about the conditions, was aware of the conditions. Significantly, when Clark spoke to Assistant Warden Gelsinger, rather than expressing a lack of knowledge of the move or the cell conditions, she stated, "Everybody gets a turn," and "Did you ever stop to think it's just you?," suggesting that she was already aware of the reassignment and the cell conditions and that there thus was supervisory involvement and coordination in the housing assignment. J.R. 1305. Clark also testified that the transfer occurred just after Sgt. Daddysman had confronted him, confiscated his religious headpiece, and then appeared to have visited the Assistant Warden's office. Taken together, the Court finds, at a minimum, a genuine issue of material fact on whether there was an agreement, tacit or otherwise, among Defendants to place Clark in the unsanitary cell and leave him there for an extended period of time. The Court will deny the Motion as to Count IV.

## V. First Amendment

In the SAC, Clark asserts a new claim under § 1983 asserting a violation of his First Amendment rights on the grounds that Sgt. Daddysman, after seizing Clark's religious headpiece, orchestrated his transfer to Miller's cell in retaliation for his demonstration of his right to free exercise of religion as reflected in his use of the headpiece. This claim is separate and distinct from the First Amendment claims asserted in the original Complaint, and dismissed based on the First Motion, that Sgt. Daddysman had (1) violated Clark's rights under the Free Exercise Clause of the First Amendment by confiscating his religious headpiece; and (2) violated the First Amendment by arranging for Clark to be transferred to Miller's cell in retaliation for having filed grievances against Sgt. Daddysman.

To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the plaintiff's First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Pursuant to the Free Exercise Clause of the First Amendment, an inmate must be given a reasonable opportunity to pursue his religion. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972) (holding that prisoners retain protections afforded by the First Amendment and thus the right of freedom of religion). Clark's wearing of a religious headpiece was a form of religious expression under the First Amendment. As for the requirement that the defendant took an action adversely affecting First Amendment rights, a plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500). Clark's assertion that he was moved to a cell with human feces for two weeks satisfies this requirement. *See id.* at 250 (finding that placing an inmate in administrative segregation constitutes an adverse action).

Finally, as to whether there is a causal connection between the protected activity and the alleged retaliatory action, such a showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Constantine*, 411 F.3d at 501. Here, Clark has alleged that he was moved on March 15, 2016, just hours after the altercation he had with Sgt. Daddysman involving the confiscation of his religious headpiece. *See id.* (finding that a period of up to four months between protected activity and retaliation can support an inference

of a causal relationship). Particularly where Clark had been in "honor housing" and then was suddenly transferred to a less favorable housing unit and placed in a cell alleged to have human feces, and Defendants have provided no reasonable explanation for this transfer, the Court finds that this element is also met. Thus, the Court concludes that there remain genuine issues of material fact on this claim such that summary judgment is not warranted at this time.

Sgt. Daddysman separately argues that he is entitled to qualified immunity on this claim as his alleged conduct did not violate a clearly established constitutional right. Government officials sued in their individual capacity may invoke qualified immunity. *Bland v. Roberts,* 730 F.3d 368, 391 (4th Cir. 2013). "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 250 (4th Cir. 1999)). To overcome a claim of qualified immunity from a § 1983 claim, there must be a showing that (1) the government official violated a federally protected right of the plaintiff; and (2) that right was clearly established at the time of the alleged misconduct, in that a "reasonable official would understand that what he is doing violates that right." *Id.* As discussed above, there is sufficient evidence to satisfy the first prong. *See supra.*

A law is "clearly established" when "the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (quoting *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980)). In the absence of such authority, the Court may rely on "'a consensus of cases of persuasive authority' from other jurisdictions" as a basis to find that conduct was barred by clearly established law. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 539 (4th Cir. 2017) (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004)). To conclude that an action

violated clearly established law, a court need not find that "the very action in question has been previously held unlawful." *Robles v. Prince George's Cnty.*, 302 F.3d 262, 270 (4th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, (1999)). Clearly established law "includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Wall v. Wade*, 741 F.3d 492, 502-03 (4th Cir. 2014) (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)). But "[w]hile there does not have to be a case directly on point," the United States Supreme Court has "stressed the need to identify a case where an officer [is] acting under similar circumstances." *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 593 (2018)).

It is firmly established that "[r]etaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper." *A.C.L.U. of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993). The reason for this principle is that "[r]etaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Id.* More specifically, in August 2015, before the incident at issue here, the United States Court of Appeals for the Fourth Circuit held in *Jehovah v. Clarke*, 798 F.3d 169 (4th Cir. 2015), that there is an actionable claim for a violation of First Amendment rights where an inmate alleged that he was intentionally placed into a cell where he experienced religiously-motivated harassment by his cellmate, and the cell assignment was "deliberately done . . . to harass" and "was motivated not by a legitimate penological concern but by animus" toward the inmate's religious beliefs. *Id.* at 180-81.

Here, Clark has asserted Sgt. Daddysman arranged to have his cell assignment changed because of retaliatory animus associated with Clark's wearing of a religious headpiece. Where such conduct, if proven, would violate clearly established law, the Court will not grant summary judgment to Sgt. Daddysman based on qualified immunity.

## VI. State Law Claims

In Counts VI, VII, and VIII, Clark asserts claims under Article 25, 36, and 40 of the Maryland Declaration of Rights. As a general matter, Maryland courts have construed Articles 25 and 40 *in pari materia* with the comparable provisions of the United States Constitution. *Miles v. State*, 80 A.3d 242, 252 (Md. 2013). Therefore, where, as discussed above, the Court will deny the Third Motion as to the corresponding First Amendment Free Speech claim against Assistant Warden Gelsinger in Count I and the Eighth Amendment claim against all Defendants in Count III, and Defendants have offered no separate argument relating to these state constitutional claims, the Court will also deny the Motion as to the Article 25 and Article 40 claims in Counts VI and VII.

As to Clark's Article 36 claim, which corresponds to the First Amendment claim in Count II based on freedom of religion, Defendants argue that there is no private right of action conferred by this provision, relying on a statement in a single district court case. *See Baird v. Haith*, 724 F. Supp. 367, 384 (D. Md. 1988) ("There is no indication in Maryland law that there is any private right of action for damages under [Article 36]"). The Court of Appeals of Maryland, however, "has recognized that a common law action for damages lies when an individual is deprived of his or her liberty in violation of the Maryland Constitution." *Okwa v. Harper*, 757 A.2d 118, 140 (2000). The Fourth Circuit, in turn, has noted that although whether there is a private cause of action under Article 36 is an "undecided" issue, Maryland state courts have nevertheless proceeded

to consider Article 36 claims "on the basis" that Article 36 and the First Amendment of the United States Constitution have the same requirements. *Booth v. Maryland*, 337 F. App'x 302, 311 (4th Cir. 2009) (citing *Stover v. Prince George's Cnty.*, 752 A.2d 686, 695 (Md. 2000), and *Supermarkets Gen. Corp. v. Maryland*, 409 A.2d 250, 258 (Md. 1979)). Where "[i]t is fundamental that state courts be left free and unfettered by [federal courts] in interpreting their state constitutions," *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940), and the Maryland Court of Appeals has generally signaled the existence of a private cause of action and certainly has not foreclosed one, the Court will not dismiss the Article 36 claim on this basis. *Cf. Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (stating that dismissal of a claim is not warranted just because it does "not fall within the four corners of [the court's] prior case law" and that dismissal of claims based on a "novel legal theory" is "especially disfavored").

Otherwise, Defendants offer no other argument for dismissal of the Article 36 claim. Defendants' qualified immunity argument does not apply to the Article 36 claim because "[a] state public official alleged to have violated . . . any article of the Maryland Declaration of Rights, is not entitled to qualified immunity." *Okwa*, 757 A.2d at 140. Accordingly, the Motion will be denied as to the Article 36 claim.

Finally, where the Court continues to retain jurisdiction over all of Clark's federal claims, the Court will continue exercising supplemental jurisdiction over Clark's negligence claim, for which no separate argument for dismissal was offered.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment will be DENIED. A separate Order shall issue.

Date: August 11, 2021



THEODORE D. CHUANG
United States District Judge